IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2021

IN RE C.N.[1] ET AL.

**Appeal from the Juvenile Court for Sumner County**
**No. 2018-JV-506    David Howard, Judge**

_____

**No. M2020-01021-COA-R3-PT**

_____

Tennessee Department of Children's Services ("DCS") removed six then-children from the custody of Deanna D. ("Mother") and David D. ("Father"), in August 2018 after receiving multiple referrals regarding the family.  After the children were in foster care for over a year, DCS filed a petition to terminate Mother's and Father's parental rights.  DCS alleged, as statutory grounds for termination, abandonment by failure to visit, abandonment by failure to establish a suitable home, failure to manifest an ability and willingness to assume custody of the children, persistence of conditions, severe abuse, and, in regards to Father only, a prison sentence of more than two years for conduct against a child.  The trial court found that DCS proved each ground for termination by clear and convincing evidence and that termination was in the children's best interests.  Mother and Father each appeal.  Following a thorough review of the record, we affirm in part and reverse in part.  We affirm the trial court's ultimate holding that the parental rights of both Mother and Father should be terminated.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, J.R., P.J., M.S. and CARMA DENNIS MCGEE, J., joined.

Matthew Edwards, Hendersonville, Tennessee, for the appellant, David D.

Cal Bowen, Jackson, Tennessee, for the appellant, Deanna D.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

---

[1] In actions involving juveniles, it is this Court's policy to protect the privacy of the children by using only the first name and last initial, or only the initials, of the parties involved.

# OPINION

## BACKGROUND

Mother and Father (together, "Parents") are the biological parents of D.D., G.D., T.D., S.D., and K.D. (together, the "Children"). The oldest child, C.N., is Mother's child and Father's step-child; however, C.N. has lived with Parents since she was an infant and was raised by Father.[2] Parents testified at trial that DCS was involved with them for many years and visited Parents' home frequently. These visits often had to do with Father's disciplinary methods, which Mother described at trial as abnormal. Specifically, Mother testified that Father had waterboarded C.N. in the past and that C.N. was made to do naked sit-ups or push-ups as punishment. DCS records reflect that the older children corroborated these allegations, and that punishment inflicted on C.N. was done in the presence of the other children.

In August of 2018, DCS received new referrals regarding the Children. The oldest three, C.N., D.D., and G.D., were interviewed by a DCS worker and law enforcement on August 23, 2018, and gave consistent reports of physical and psychological abuse. C.N. and D.D. expressed fear that Father's father ("Grandfather"), with whom the family lived, would harm the Children's cat in retaliation for the Children's removal. It was also noted that two of the younger children, S.D. and T.D., were not toilet-trained despite the fact that S.D. was almost five and T.D. was eight at the time. Additionally, T.D. was nonverbal and was not attending school. Soon thereafter, DCS filed an emergency petition for legal custody of the Children in the Juvenile Court for Sumner County (the "trial court"), alleging that all three older children were interviewed separately but gave consistent accounts of abuse within the home. In particular, the petition alleged that C.N. disclosed being forced to do naked sit-ups in front of Father and Grandfather, as well as being told by Father that he would shoot C.N. in the back of the head. The petition also averred that D.D. disclosed to DCS having seen C.N. be locked under the kitchen sink and that Grandfather killed animals in front of the Children. DCS records note that during a forensic interview, T.D. mimed "the action of a shot gun then the gun hitting [] something which

---

[2] At the time of their removal by DCS, C.N. was just shy of sixteen, D.D. was fourteen, G.D. was twelve, T.D. was eight, S.D. was four, and K.D. was nearly two. C.N.'s biological father was also named as a defendant in this action but never participated. In any event, C.N. reached the age of majority approximately two months after the trial court entered its order terminating Parents' rights. Under the circumstances, we conclude that this case is moot as to C.N. *See In re Jeffery B.*, No. W2012-00924-COA-R3-PT, 2012 WL 4854719, at *1 n.2 (Tenn. Ct. App. Oct. 12, 2012); *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *12 (Tenn. Ct. App. May 15, 2009); *see also* Tenn. Code Ann. § 36-1-102 (13), (39) (defining "child" as "any person or persons under eighteen (18) years of age[,]" and defining "parental rights" as "the legally recognized rights and responsibilities to act as a parent, to care for, to name, and to claim custodial rights with respect to a child"); *but see In re Jeremy C.*, No. M2020-00803-COA-R3-PT, 2021 WL 754604, at *6 n.5 (Tenn. Ct. App. Feb. 26, 2021) (reviewing trial court's decision to terminate mother's parental rights despite son reaching age of majority during the pendency of the appeal). C.N. is nonetheless important for the factual background of this case and is discussed for that purpose.

[T.D.] vocalized to be the dog." Older children C.N. and D.D. confirmed to DCS that Grandfather had killed the family's dog in front of T.D. An order removing the Children from Parents' custody was entered on August 23, 2018, and a preliminary hearing was set for August 29, 2018. A no-contact order was entered against Father as to Mother and the Children.[3]

The Children were placed in DCS custody and Father was arrested and charged with aggravated child abuse involving a child under the age of eight. Father testified at trial that the criminal charge stemmed from the allegations made by C.N. Father remained incarcerated until June 17, 2019, and his participation in the DCS case was minimal until his release. Upon entering DCS custody, the Children were all in poor condition. Although they were dressed appropriately, the Children had an odor. T.D. was eight years old but knew approximately twenty-five words and still wore diapers. Several of the Children had speech delays. S.D., the four-year-old, appeared to have the developmental capacity of a two-year-old, was not toilet-trained, and referred to everyone as "mommy." G.D. was withdrawn. The Children underwent forensic interviews, during which the Children disclosed witnessing domestic violence within the home and overhearing Father making statements about wanting to have sex with C.N. DCS notes reflect that Father denied all of the Children's allegations and blamed abuse of the younger children on C.N. Father relayed that in the past, C.N. and a friend had waterboarded T.D., the eight-year-old, and that C.N. had previously waived a gun and a knife at the younger children. Mother also later reported to a DCS caseworker that C.N. and a friend had once locked T.D. in a bathroom, gagged and hit him. Mother also disclosed fear that C.N. and the same friend had molested S.D., the four-year-old.

At a child and family team meeting ("CFTM") on August 29, 2018, Mother relayed that she was fearful of Father and Grandfather and accused Grandfather of abusing prescription medication. Mother had also left the family home on August 23, 2018 and was staying in a motel paid for by DCS. After the motel, DCS arranged for Mother to stay in a women's shelter for a few weeks. In early September 2018, Mother chose to return to Kentucky where she is from and where her parents (the "Maternal Grandparents") still reside. DCS entered into an initial permanency plan with Parents on September 11, 2018. Mother participated in the creation of the initial plan. Although Father was incarcerated, he was represented by counsel at the ratification hearing for the permanency plan. Among other things, the plan required Father to undergo a psychological evaluation with an I.Q. component, complete anger management and parenting classes, provide DCS with a legal means of income, allow DCS to complete a walk-through of Father's home, and abide by the protective order. As to Mother, the plan required a psychological evaluation, individual

---

[3] The no-contact order itself is not in the record; however, no one disputes that Father was ordered not to have contact with the Children, and the no-contact order was discussed in testimony. *See In re Alexis S.*, No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *5 n.6 (Tenn. Ct. App. Nov. 30, 2018). Grandfather was also purportedly subject to a no-contact order between him and the Children, although this order also is not in the record.

therapy, safe and stable housing, open communication with DCS, and a parenting assessment.

The Children were placed in a foster home together, and Mother was allowed two hours of supervised visitation per week plus phone calls with the Children. In an October 2018 provider summary, DCS noted that "[Mother] is currently in the process of securing housing [for the Children]. Once she is in appropriate housing and DCS can do a home visit to verify the residence is appropriate, placement with [Mother] will be considered." Nonetheless, DCS noted early in the case that Mother struggled with mental health issues and a non-specified intellectual impairment.[4] Mother struggled with appropriate communication with the Children, and Mother was informed in late September 2018 that her phone calls would be restricted until DCS could talk to Mother's lawyer. DCS noted in its file that the Children "were constantly under the impression they were going home and they would have different dates in mind and information that [the FSW] . . . did not give them." Mother also contacted the Children at all hours of the day and night, and even after the contact was restricted, Kayla H. ("Foster Mother") discovered an extra phone in the possession of C.N. One day, Mother called the Children's FSW multiple times and claimed that Foster Mother had pulled a gun on C.N. and that C.N.'s teeth had been knocked out. However, when the FSW checked on C.N. at school, C.N. was fine. Mother also requested that Foster Mother be prohibited from attending T.D.'s IEP meetings at school.

At first, Mother regularly saw the Children and frequently communicated with them via phone and Skype. Mother reported in September of 2018 that Maternal Grandparents were providing Mother with a house. Additionally, the Children showed some improvement. By September, T.D. was attending school and his teachers developed a bathroom schedule to help with toilet-training. T.D. was largely toilet-trained by October 2018. S.D.'s toilet-training and communication had also somewhat improved by October 2018, and all of the Children were enrolled in various forms of therapy. G.D. and C.N. had cavities filled, and K.D. was treated for some hearing loss as well as some speech therapy. While D.D.'s mental health was a concern and it was noted that he had trouble with his anger, he began seeing a therapist to better learn how to express himself. Additionally, Foster Mother's husband, Steve H. ("Foster Father" or together with Foster Mother, "Foster Parents"), discovered that D.D. had a talent for repairing electronic devices. D.D. began helping Foster Father with his business, which entailed putting electrical in houses, and Foster Father began teaching D.D. about saving money and budgeting. Overall, the record shows that the Children's physical and emotional condition improved once placed with Foster Parents, and the Children and Mother were able to attend some therapeutic visitation with one another. Given Mother's living arrangements, DCS provided Mother with transportation vouchers to help Mother attend visitation and therapy.

---

[4] Mother testified at trial that she was involved in a car accident in 1997 during which she was knocked unconscious for two hours and suffered a serious head injury.

Some visitation and phone calls with Mother were successful and appropriate, and in December 2018, DCS noted that Mother had "completed all of the assessments DCS asked her to do." The situation with Mother deteriorated, however, towards the end of 2018. Mother continued to contact the Children outside of the scheduled hours, refused to provide Foster Mother with immunization records for S.D., and again called the Children's school and demanded that Foster Mother be restricted from attending the Children's IEP meetings. When asked about this, Mother claimed that her Facebook had been hacked and denied calling the school regarding the IEP meetings. Both Mother and Maternal Grandparents had to be counseled about making baseless accusations against Foster Mother. Mother also had to be counseled about bringing too many people to therapeutic visitation, because at one visit Mother brought a friend who filmed and took pictures of the session.

Pursuant to the Interstate Compact on the Placement of Children ("ICPC"), DCS submitted a request for an inspection of Mother's home to Kentucky's Department for Health and Family Services. The request for placement was denied on December 18, 2018 because Kentucky's Department for Community Based Services ("DCBS") determined Mother's home was not suitable for the Children. Mother's brother was living in the home; the DCBS report notes that the brother had been charged with felony wanton endangerment involving a firearm. DCBS also reported that during its visit, Mother would not get off of her phone in order to be interviewed and would not answer questions about her plans for the Children. It also did not appear to DCBS that Mother actually lived in the home; although there were beds, there were no personal items of Mother's and most items were being stored in bins. Finally, DCBS expressed concern over Mother's mental health, explaining that Mother had shown up at the DCBS office several times demanding a home study be conducted immediately, and was generally hostile, confused, evasive, and difficult to work with.

During January of 2019, some of the Children regressed. While Mother was still frequently talking to the Children over the phone, DCS notes show that these calls were not always productive. In particular, Mother had difficulty communicating with T.D., who mainly communicated with Mother through short phrases and grunting. Around this time, T.D. reverted to defecating on himself and hiding his underwear in the vents of Foster Parents' home. S.D. was physically aggressive towards her siblings and had difficulty expressing herself appropriately, and C.N. was secretly using social media despite having been prohibited from doing so. On February 26, 2019, DCS filed an emergency petition to suspend Mother's visitation, claiming that bouts of regression were occurring after contact with Mother and that generally, the communications between Mother and the Children were inappropriate and problematic.[5] DCS also noted that the ICPC request to

---

[5] For example, in one phone call, Mother told D.D. to be careful and not to accept "bribes" from anyone. In another phone call, Mother kept stating that Foster Mother was not feeding the Children.

Kentucky had been denied and that DCBS was concerned about Mother's mental health. DCS requested that Mother undergo an additional mental health assessment. The trial court granted this petition in an order entered March 20, 2019, *nunc pro tunc* to February 27, 2019.

Mother's visitation was never reinstated.[6]  While Mother claimed at trial that she was unable to get another mental health evaluation due to circumstances outside of her control, DCS averred that Mother failed to get the assessment notwithstanding DCS's best efforts.  Additionally, Kentucky denied two more ICPC requests for placement with Mother.  The second request was sent in March of 2019.  A DCBS caseworker met with Mother and Maternal Grandparents on April 10, 2019 at Maternal Grandparents' home. Mother's brother was also living in this home at the time.  The ICPC documents provide that Mother, Maternal Grandparents, and the brother were all living in the three-bedroom house and that there was no room for the Children.  The case worker also noted that the brother was under a "DVO" by his ex-wife and had a criminal history.  Further, DCBS explained that it had concerns about both Mother's and Maternal Grandparents' ability to care for the Children, stating that "the family does have intellectual limitations that would impair their ability to care for the [C]hildren."  Additionally, no one in the family was able to verbalize a plan for transporting the Children to and from school or for accommodating the Children's special needs.

DCBS attempted a third and final home inspection in May 2019.  Mother reported that she was again living in her parents' rental house, and a DCBS case worker went to the house on May 15, 2019.  It appeared to the case worker that no one actually lived in the house, and the case worker was unable to reach Mother.  The case worker did speak to a neighbor, however, who signed an affidavit providing that no one lived in the house, that Mother would sometimes come to check the mail, and that Mother had approached the neighbor's husband about "how to write up a fake lease."  The request for placement was denied and DCBS recommended that due to Mother's disabilities, she be referred to a program called UK Comprehensive Assessment Training Services ("CATS"), which provides various psychological assessments, therapies, and resources for those who qualify.  Accordingly, by May of 2019, Kentucky's DCBS concluded that the Children could not be placed with Mother without further assessment and support for her disabilities.

In the meantime, Father was released from jail on June 17, 2019, after having plead guilty to attempted aggravated child abuse of a child under the age of eight, pursuant to Tennessee Code Annotated section 39-15-402. Father's total effective sentence was twelve years, but he was released and was serving the remainder of his sentence on supervised probation.  Upon discovering that Father was released from jail, D.D. expressed fear about returning to Father and told the FSW that D.D. was afraid Parents would reconcile.  Despite

---

[6] DCS records reflect, however, that Mother continued to contact the Children and Foster Mother via social media in violation of the no-contact order.

having been toilet-trained for several months, T.D. experienced episodes of encopresis and enuresis after learning about Father's release. Additionally, the FSW and Foster Mother suspected Mother and C.N. were communicating secretly because C.N. told the younger children that they would be going home soon. T.D.'s accidents increased after hearing this.

Although the no-contact order between Father and the Children was still in place, Father attended a CFTM on September 17, 2019, and was told he needed to complete a parenting assessment, parenting classes, and therapy before supervised visitations could begin.[7] The record shows that Father completed a parenting class on August 21, 2019, as well as an anger management class on October 8, 2019. On October 29, 2019, Father filed a motion asking for visitation with the Children, averring that Father was following the permanency plan as well as the conditions of his probation. The trial court entered an order denying this motion on November 22, 2019, concluding only that the request was denied based "on the record as a whole."

DCS filed a petition to terminate Parents' rights to the Children in the trial court on November 14, 2019. The grounds alleged against Mother were abandonment by failure to visit, abandonment by failure to provide a suitable home, failure to manifest an ability and willingness to assume custody of the Children, persistence of conditions, and severe child abuse. The grounds alleged against Father were the same, in addition to the ground of a prison sentence of two or more years for conduct against a child amounting to severe abuse. Parents responded to the petition, denying that grounds for termination existed and that termination was in the Children's best interests. Neither parent saw the Children between the filing of the petition and trial. Mother did not complete the additional mental health assessment requested by DCS, but Father underwent a psychological evaluation on April 29, 2020. By this time, Father was still living with Grandfather.

The Children remained together in their placement. Although the record shows that the Children had improved since their removal, they were still struggling in many ways as of January 2020. T.D. had continued issues with bowel control, nightmares, and bedwetting, and communicated to the FSW his ongoing fear of "mean dad." The youngest two children, S.D. and K.D., still required speech therapy. While they could communicate in some ways, T.D., S.D., and K.D. were still essentially nonverbal. K.D. was known to hoard food and overeat. G.D. still tended to be withdrawn and to internalize stress; D.D. parented the other children[8] and could not always control his anger. All of the foregoing coincided with the Children learning about the termination proceedings.

Trial was held on July 9, 2020 and July 10, 2020. Parents were divorced by the time of trial and Mother was still living in Scottsville, Kentucky. Mother admittedly had not

---

[7] Mother was invited to this CFTM but did not attend.
[8] At one point, D.D. disclosed to his FSW that D.D. felt the need to monitor the other children's behavior because this previously kept him out of trouble with Father and prevented "whoopins."

had visitation with the Children since the suspension of her visitation the previous year. While Mother also admitted that she had not completed a second psychological evaluation, she maintained that her insurance would not cover it and that DCS was supposed to arrange it for her. Mother testified that she sent confirmation of her insurance to DCS and that DCS never scheduled the evaluation for her. Mother also maintained that she did not need a second evaluation.

Mother testified that she was in a car accident in 1997 in which she sustained a serious head injury. Mother stated that she has been "nervous" ever since and receives social security and disability due to her injuries and her "manic depressive." When questioned about whether Father abused the Children, Mother was evasive and had difficulty answering the questions. For example, the following exchange between Mother, DCS, and the Court is reflective of Mother's testimony as a whole:

> Q. (By Ms. Fisher) So did you feel like your children wouldn't be safe with [Father]?
>
> A: That's an answer the good Lord would only know.
>
> Q. But in your opinion, how do you feel about that?
>
> A. (No response).
>
> The Court: Do you believe that the [Children] are safe with [Father]?
>
> The Witness: Well, they want to be with me, so . . .
>
> The Court: Okay. And I understand that.
>
> The Witness: And it's under the – it's a safety, you know.
>
> The Court: But do you – Ms. Fisher's question and my question, I suppose, is, do you believe the [Children] are safe with [Father]? Regardless of whether they're going to be with you or not, do you believe that they're safe with him?
>
> The Witness: Is there any way I can speak to my lawyer for a minute?
>
> The Court: Well, not right now.

Mr. Zanger: You've got to answer his question, Deanna.

The Court: I mean, if you believe so, then, that's okay, and if you don't believe that they would be, that's ok, too. You just have to tell me.

Mr. Zanger: Your Honor, if I may try to move things along. Deanna, just tell the truth.

The Witness: How do you answer that?

Mr. Zanger: With the truth. We talked about this. Answer the question truthfully.

The Witness: No.

The Court: Thank you. Appreciate it.

Much of Mother's testimony proceeded in this manner. Although Mother testified that she did not believe the Children were safe with Father, she also testified that she would intervene if and when Father needed to "cool it." When asked about whether she had ever seen Father hit or push the Children, Mother's response was "I would tell him to cool it. Because when you understand people, you know, you help out." Another exchange between the guardian ad litem and Mother proceeded as follows:

Q. Okay. My question to you is, were [the Children] emotionally abused by [Father]?

A. The way I see it and weigh the abilities that I know of the [C]hildren and everybody else, yes.

Q. Okay. So the next question to that would be, were [the Children] physically abused by [Father]?

A. Only God would know the answer and the person that did, you know what I mean?

Despite her evasive testimony, Mother agreed that Father's discipline of the Children "wasn't normal," and that she had previously seen Father punish C.N. in "the nude" and that C.N. was "waterboarded." Mother also indicated that she saw "handprints" on D.D. and that on one occasion, T.D. communicated to Mother that Grandfather had beaten T.D.'s legs with a gun stock. According to Mother, T.D. communicated this by showing Mother the bruises and then bringing Mother the gun. Mother also testified that

the Children would disclose to her incidents of physical abuse, but Mother also claimed that she never witnessed abuse herself. Regarding the family dog, Mother testified that the Children disclosed to her that Grandfather killed the dog with a board in front of T.D. Mother also testified that she herself was fearful of Father and Grandfather.

Mother was very critical of DCS and maintained that DCS did not sufficiently assist Mother. Mother testified that she provided DCS with proof that her insurance would not pay for a second psychological exam and that DCS never acted upon this information. Regarding visitation, Mother explained that DCS provided her with transportation vouchers but that Mother had difficulty using them in Kentucky, rather than in Tennessee. Mother testified that DCS promised to provide her with gas cards but that this never materialized. While Mother agreed that DCS paid for Mother to stay in a motel just after her removal from the family home and then took Mother to a women's shelter for a short period of time, Mother maintained that DCS did nothing to further assist her. Mother also alleged that the family's DCS team leader once assaulted Mother at a meeting, and maintained that DCS and Foster Mother instructed the Children to tell lies about Mother. Mother remained adamant at trial that the Children should return to her care and that DCS had no grounds to remove the Children in the first place.

Father denied all allegations of abuse and maintained that he pled guilty to attempted aggravated child abuse as a "best interest" plea to get out of jail. Although Father was sentenced to twelve years, he was serving the remainder of the sentence on probation. Father took great issue with Mother's testimony and denied having made C.N. do calisthenics in the nude. Father also maintained that the family dog died of natural causes. Generally, Father testified that Mother and C.N. were out to get him and that while he may have raised his voice at the Children too often, he never physically harmed any of them. Rather, Father testified that C.N. was violent towards the younger children on more than one occasion, and that C.N. was the one who "waterboarded" T.D. Father recounted this particular event as follows:

> Q. So did you tell DCS back in 2018 that you had seen [Mother] waterboard T.D. before?
>
> A. No, but the deal with the waterboarding, is – falls – I was at an auction or I was turkey hunting that day. I came home. [T.D.] was standing right there in the living room. He was shaking. He had a towel wrapped around him. In turn, I asked [T.D.] In turn, which, you know, his vocabulary isn't that good. In turn, what happened, I walked over there [sic] pulled the towel. He had handprints on him. He was bruised from head to toe. And the way I understood it, [C.N.'s friend], and C.N.'s the one that done that.
>
> And the way I understand it, [Mother] was supposed to help bust in the door to help, I guess, get him. And what I was told that he was held under

the faucet in the bathtub. I was told he had a rag stuck in his mouth. He demonstrated, as [Mother] kind of put it, that he kept showing like, you know, something got shoved in his mouth. And I was told by [C.N.] that [T.D.] was followed by [C.N.'s friend].

According to Father, T.D. was approximately four years old when this occurred, and C.N. was eleven or twelve. Father further testified that C.N. pointed a gun at one of her younger brothers on another occasion. While Father maintained that no animals were killed in front of the Children, Father recalled an incident in which T.D. killed a duck with a brick and Father skinned the duck and cooked it for dinner.

Father testified that he had "given up" on toilet-training the Children because Father was "tired of DCS coming to the house" and "accusing [Father] of stuff." According to Father, the toilet-training and most of the parenting fell to Mother, and Father believed T.D. would "come into it on his own." Father also testified that he had seen Mother grab the Children and "sl[ing] them on the couch by their arm" and hit them with a paddle.

In response to DCS's allegation that Father failed to communicate with them throughout the custodial period, Father testified that his criminal defense attorney advised him not to speak to DCS before the resolution of the criminal case. Father also stated that he was trying to abide by the no-contact order. By the time of trial, Father had completed his psychological evaluation and testified that he had been going to therapy. Father also offered pictures reflecting several repairs around his home, including new dry wall, paint, and new flooring in the kitchen and bathroom. Although Father testified that he would be nervous to see the Children and regain custody, he maintained that he never abused the Children and that they could safely be returned to him. Father still lived with Grandfather by the time of trial.

The trial court also heard from Father's sister, Amanda D. Amanda D. and her two children lived out of state but would come and visit the family one to three times per year and would stay for varying periods of time. Amanda D. testified that she saw Father do the "usual yelling" at the Children but only when necessary. On the other hand, Amanda D. also testified that she had seen Mother grab T.D. by his arms and throw him onto the couch, and that Amanda D. witnessed Mother calling C.N. "stupid" and "ignorant." Ultimately, Amanda D. maintained that Father loves the Children and echoed Father's position that Mother and C.N. fabricated the allegations against Father.

Ty Turner, a DCS caseworker who was assigned to the family in January 2020, also testified. Mr. Turner testified that in order for DCS to pay for Mother's second psychological evaluation, Mr. Turner needed proof from Mother that her insurance would not cover the assessment. DCS offered into evidence a chain of emails between Mr. Turner and Mother's attorney showing that Mother's attorney sent Mr. Turner a copy of Mother's insurance card but the picture was blurry. Mr. Turner maintained that he would have tried

to help Mother obtain the second assessment had she and her attorney provided DCS the necessary information. Regarding Father, Mr. Turner testified that Father had been attempting to comply with the permanency plan and had completed his classes as well as a psychological evaluation.

Regarding the Children, Mr. Turner testified that they were still doing well in Foster Parents' home at the time of trial. Despite certain restrictions due to COVID-19, Mr. Turner was still able to see the Children face-to-face regularly, and they seemed bonded to Foster Parents. Mr. Turner testified that he was able to communicate some with T.D. but that T.D. often spoke too quickly for Mr. Turner to understand. Mr. Turner did not testify as to whether Foster Parents wish to adopt any of the Children.

The trial court entered its final order on July 17, 2020, determining that DCS proved all alleged grounds for termination as to both Mother and Father. The trial court also determined that termination of Parents' rights was in the Children's best interests. Both Mother and Father filed a timely notice of appeal to this Court.[9]

## ISSUES PRESENTED

With regard to Parents, we consider the following issues:

1) Whether the trial court correctly determined that DCS proved the grounds for termination by clear and convincing evidence.[10]

2) Whether the trial court correctly determined that DCS proved, by clear and convincing evidence, that termination is in the Children's best interests.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of

---

[9] Upon motion by DCS, we remanded this case back to the trial court on March 31, 2021, for correction of a clerical mistake in the trial court's final order. An amended order was entered May 18, 2021.

[10] In his brief, Father challenges only three statutory grounds: abandonment by failure to visit, abandonment by failure to provide a suitable home, and failure to manifest an ability and willingness to assume custody of the Children. Nonetheless, pursuant to our Supreme Court's holding in *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016), we must make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate" Father's parental rights. Mother challenges all of the grounds found against her.

- 12 -

the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522–23. Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as

supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

## DISCUSSION

## I. Grounds for Termination

The trial court terminated Mother's and Father's parental rights to the Children pursuant to multiple statutory grounds. We address each statutory ground, as it pertains to each parent, in turn.

### A. Abandonment by Failure to Visit

Tennessee Code Annotated section 36-1-113(g) provides that abandonment, as defined in section 36-1-102, is a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2017 & Supp. 2019). Section 36-1-102 provides that abandonment occurs, among other instances, when:

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

*Id.* § 36-1-102(1)(A)(i). Abandonment by failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). A parent may assert the absence of willfulness, which must be proven by a preponderance of the evidence, as an affirmative defense to abandonment by failure to visit. *Id.* § 36-1-102(1)(I).

- 14 -

*Father*

Here, the salient time period for Father's failure to visit is July 13, 2019 through November 13, 2019.[11] The trial court made the following relevant findings of fact and conclusions of law regarding Father's failure to visit the Children:

> [T]he two primary impediments to the Father's visitation were the September 2018 no contact order and the fact that [Father] was incarcerated for approximately ten months of the [C]hildren's custodial episode. During this time, however, it is interesting to note that the Father testified that his Criminal Court attorney had advised him not to cooperate with DCS. It was not until he was released from incarceration that he began working services, some of which were completed before the Petition for Termination had been filed and some of it well after the Petition had been filed.

> The Court finds by clear and convincing evidence that the Father has abandoned the [C]hildren for his failure to visit. Though the Father's visits were impeded by the 2018 order and his August 2018 to June 2019 incarceration, the Father was released from incarceration on June 17, 2019, but did not seek a visitation schedule until October 29, 2019. The Petition to Terminate Parental Rights was filed November 14, 2019. Technically, this would be within the four months as contemplated by Tenn. Code Ann. § 36-1-102. By this point, however, the Court was already aware of the Father's conviction for Attempted Aggravated Child Abuse of a Child Under 8 Years which gave the Court further pause as it related to Father's ability to have visitation.

On appeal, Father argues that his failure to visit the Children was due to the trial court's no-contact order and was therefore not willful. Father further argues that he proved lack of willfulness by a preponderance of the evidence, per Tenn. Code Ann. section 36-1-102(1)(I), and that the trial court failed to make a finding as to this argument.

When a parent's contact with a child is limited by court order, the parent may abandon the child through failure to visit if "the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so[.]" *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014); *see also In re Jason S.*, No. E2020-01479-COA-R3-PT, 2021 WL 1575469, at *6 (Tenn. Ct. App. Apr. 22, 2021) (mother willfully failed to visit children by failing to present court with evidence of sobriety, despite no-contact order providing that

---

[11] *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (for purposes of abandonment, the four-month period "includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed").

visitation could be reinstated should mother do so); *In re Jaylah W.*, 486 S.W.3d 537, 552 (Tenn. Ct. App. 2015) (citations and bracketing omitted) ("When a parent chooses not to cooperate with certain conditions, such as obtaining a drug and alcohol abuse assessment, that choice in refusing to cooperate constitutes a willful decision to discontinue visitation.") (internal quotations omitted). For example, in *In re Alexis S.*, No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *6 (Tenn. Ct. App. Nov. 30, 2018), the mother's visitation was suspended due to ongoing problems with substance abuse. Because Mother failed to address those issues, we concluded that the "[m]other's awareness of the steps necessary to reinstate her visitation rights and her inaction with respect to those steps constituted a willful decision to discontinue her visitation with the [c]hildren." *Id.*

The question before us, then, is whether Father proved that he attempted to change his situation such that the no-contact order could be lifted and his visitation reinstated. Upon thorough review of the record, we conclude that Father made this showing and proved, by a preponderance of the evidence, that his failure to visit the Children was not willful.

Father was undisputedly prohibited from having contact with the Children during the relevant four-month period. Nonetheless, Father attended a CFTM on September 17, 2019 and inquired about supervised visitation. DCS records reflect that Father was told he needed to complete a parenting assessment and parenting classes, and attend therapy before his visitation could be reinstated. Father completed parenting classes and an anger management course. Father then filed a motion for visitation on October 29, 2019, which provides that Father would accept whatever visitation the court deemed appropriate. This motion was denied, and the order denying the motion does not explain what was required of Father to regain visitation. The order provides simply that the request for visitation was denied based on the "record as a whole." It is unclear from the trial court's order what was specifically required of Father to regain visitation. *See In re Jaylah W.*, 486 S.W.3d at 551 (failure to visit was willful when order denying request for visitation contained clear directives as to how mother could regain visitation and "provided a mechanism" for doing so).[12] The foregoing militates against a finding that Father "had the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fail[ed] to do so[.]" *In re Kiara C.*, 2014 WL 2993845, at *6. Rather, during the relevant four-month period, Father quickly began completing the tasks required by DCS.

Perhaps more importantly, the trial court stated in its final order that by the time it ruled on Father's motion for visitation, "the Court was already aware of the Father's conviction for Attempted Aggravated Child Abuse of a Child Under 8 Years which gave

---

[12] Additionally, because the actual no-contact order is not contained in the record, it is unclear whether that order explained how Father could reinstate visitation. *See In re Jason S.*, 2021 WL 1575469, at *6 (concluding that mother's failure to visit was willful notwithstanding no-contact order where "pursuant to the no-contact order, [m]other was allowed to seek visitation upon filing to reinstate it and presenting herself to the court").

the Court further pause as it related to Father's ability to have visitation." As best we can discern from the record before us, the trial court never intended to allow Father visitation with the Children due to Father's conviction for attempted aggravated child abuse, regardless of Father's attempts at reunification. While under the circumstances we take no issue with that ruling, by the same token Father cannot be said to have willfully failed to visit the Children.

In light of the steps taken by Father during the relevant four-month period, and the trial court's above statement, we agree that Father proved by a preponderance of the evidence that his failure to visit the Children was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). The termination of Father's parental rights pursuant to this ground is therefore reversed.

### *Mother*

Like Father, Mother's visitation with the Children was restricted by the time of trial. The trial court's findings and conclusions regarding Mother's failure to visit provide in pertinent part as follows:

> The Court finds by clear and convincing evidence that the Mother has abandoned the [C]hildren for her failure to visit. Though, obviously disputed by the Mother, it would appear to the Court that she began with consistent in-person and telephone visitation. It would further appear to the Court that the Mother's own conduct created the circumstances under which her visitation was suspended. But even suspended, the Court indicated resumption of visitation could occur upon the completion of a second evaluation. At no time does it appear the Mother moved to resume visits or complete the evaluation.

In contrast to Father, we agree with the trial court that Mother was fully aware of the impediments to her visitation and simply failed to remedy the situation. Mr. Turner testified at trial that he could help Mother obtain DCS funding for a second psychological evaluation but that he first needed proof that Mother's insurance would not cover an assessment. Mr. Turner testified that he had multiple conversations with Mother and her counsel about this and that Mr. Turner never received the information he needed. Mother testified at trial that she saw a doctor about doing the assessment but did not want to pay for it out of pocket. Moreover, "Mother's own conduct led to the suspension of the visitation[,]" and Mother continued the same behavior after the suspension. *In re Addison P.*, No. E2016-02567-COA-R3-PT, 2017 WL 1861781, at *8 (Tenn. Ct. App. May 8, 2017). Specifically, Mother continued to contact Foster Mother and the Children at inappropriate times and over social media. Consequently, Mother had "the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation" but failed to do so. *In re Kiara C.*, 2014 WL 2993845, at *6.

- 17 -

On appeal, Mother asserts that there is no evidence in the record as to why Mother's first psychological evaluation was insufficient or why Mother needed a second evaluation. Nonetheless, Mother cites no legal authority explaining how this relates to Mother's failure to visit the Children. Moreover, we disagree with Mother's characterization of the record. The record reflects that DCS required further evaluation of Mother due to her erratic behavior, inappropriate communications with the Children, and Kentucky's refusal to approve Mother's home. Mother's argument lacks merit.

Mother undisputedly failed to visit the Children during the relevant four-month period and did not establish at trial that her failure to seek and reinstate visitation was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). Accordingly, we agree with the trial court that this ground was proven by clear and convincing evidence as to Mother.

### B. Abandonment by Failure to Provide a Suitable Home

Abandonment can also occur when:

(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

*Id.* § 36-1-102(1)(A)(ii)(a)-(c).

Here, we "consider[] whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home entails "[a]ppropriate care and attention" for the child, *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home is "free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014). DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. The Department should utilize its superior resources in assisting with establishment of a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015); *see also In re Matthew T.*, 2016 WL 1621076, at *7. Sole responsibility does not lie with DCS, and "[p]arents must also make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child." *In re Hannah H.*, 2014 WL 2587397, at *9.

While the statute requires DCS to make reasonable efforts towards the establishment of a suitable home for "a period of four (4) months following the physical removal" of the child, "the statute does not limit the court's inquiry to a period of four months immediately following the removal." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016).

### *Father*

Here, the trial court found that Father failed to establish a suitable home due to Father's continued dependence on Grandfather. The trial court explained:

> During his incarceration, Father refused to work with DCS. Once released from incarceration, it appears that he returned to what had been the family's home and continued to reside with [Grandfather]. He also began to work services. Since being released, he has completed his Parenting Course, Anger Management Course, psychological assessment, and is moving

forward with therapy.

To Father's credit, he has also worked on the physical circumstances of his home environment. The photos he provided as an Exhibit to his testimony show an older home, yes, but clean and appropriate. Mr. Turner's testimony confirmed that the Father's home is appropriate with no safety concerns. He even successfully addressed the one issue mentioned by DCS.

A negative concerning the Father's environment is the ambiguity of his income. There was much ado made about the Father's financial situation, as it appears to the Court that the only financial data he submitted to DCS and to the Court itself indicates only the [Grandfather's] income. While it appears to this Court that the Father farms for a living, he supplied no income data to support his claims of sufficient income.

Finally, another concern is the fact the Father remains in the residence with [Grandfather]. In addition to the very troubling testimony about this man, particularly the allegations of abuse against both the [C]hildren and the family dog, this Court issued a no contact order between him and the [C]hildren that has never been modified or set aside. While the Father may choose to deny the allegations as false, the Court would have serious concerns about returning the [C]hildren to the Father's home while [Grandfather] continued to live there.

On appeal, Father's sole argument is that because the trial court found Father's home was physically appropriate, DCS did not prove this ground by clear and convincing evidence. In contrast, DCS asserts that Father would not work with DCS during Father's incarceration and that even after he was released from jail, Father continued to reside with Grandfather and did not establish a legal source of income. DCS urges that during the four months following the Children's removal, August 23, 2018 through December 23, 2018, DCS made reasonable efforts to help Father establish a suitable home and that because Father would not meet with DCS, this ground has been proven by clear and convincing evidence.

The record does not preponderate against the finding that Father's home remains unsuitable for the Children and that DCS made reasonable efforts to assist Father.[13] While

---

[13] DCS argues that the relevant four-month period in this case is the period immediately following the Children's removal, August 23, 2018, through December 23, 2018. Nonetheless, efforts to establish a suitable home are naturally hampered when a parent is incarcerated. *See, e.g.*, *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *8 n.8 (Tenn. Ct. App. July 6, 2021); *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *11 (Tenn. Ct. App. Apr. 9, 2021); *In re Allyson P.*, No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *8 (Tenn. Ct. App. June 17, 2020). For this reason, in *In re James W.*, this Court looked to a four-month period "follow[ing] the children's removal from [m]other's

- 20 -

it is undisputed that the physical structure of Father's residence is safe and appropriate, a suitable home requires "more than a proper physical living location." *In re Daniel B.*, 2020 WL 3955703, at *4. Grandfather's presence in the home was an issue from the outset of this case, inasmuch as Father's permanency plan required him to have a residence free from unsafe and dangerous people. The record corroborates the trial court's concerns regarding Grandfather, and by the time of trial Father had had nearly two years to establish a home away from Grandfather. Although Father denied all abuse allegations regarding Grandfather, the trial court clearly did not credit this testimony. *See Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 824–25 (Tenn. Ct. App. 2012) (noting that even in the absence of an express credibility finding, a "finding on credibility may be implied from the manner in which the trial court decided the case"). Further, Father does not dispute on appeal the existence of a no-contact order between Grandfather and the Children, but also fails to make any argument as to why the home is nonetheless safe. Insofar as a suitable home is one "free of . . . domestic violence[,]" *In re Hannah H.*, 2014 WL 2587397, at *9, we conclude, as the trial court did, that Grandfather's presence renders Father's home unsuitable. It is unlikely this issue will be resolved at an early date.

Further, throughout the custodial period, even when Father was incarcerated, DCS made reasonable efforts to assist Father with establishing a suitable home; indeed, early in the case DCS attempted to meet with Father and he declined. Although DCS made further efforts to assist Father when he was released from prison, Father never attempted to establish a home away from Grandfather and instead focused on renovating the home. "Ultimately, [ ] we must 'analyze the reasonableness of DCS's efforts to assist a parent on a 'case-by-case basis in light of the unique facts of the case.'" *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *10 (Tenn. Ct. App. Nov. 6, 2020) (quoting *In re Kaden W.*, No. E2018-00983-COA-R3-PT, 2019 WL 2093317, at *7 (Tenn. Ct. App. May 13, 2019)). Under the circumstances of this case, we conclude, as the trial court did, that Father failed to establish a suitable home for the Children. This ground was proven by clear and convincing evidence.

---

custody and span[ning] a period during which [m]other was not incarcerated[,]" as opposed to the four-month period directly following the children's removal from the mother's custody. 2021 WL 2800523, at *8 n.8. In the present case, there is a dearth of evidence regarding Father and DCS during the period directly following the Children's removal; the record reveals only that DCS attempted to arrange a meeting at some point during this period and that Father declined. While this weighs against Father, we also find it probative, under the particular circumstances of this case, to consider the four-month period following Father's release from prison. *See In re James W.*, 2021 WL 2800523, at *8 n.8. In any event, DCS made reasonable efforts to assist Father with establishing a suitable home throughout the custodial period. *See In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *6 (Tenn. Ct. App. Nov. 9, 2021) ("The record is also replete with the efforts that DCS took to help [f]ather establish a suitable home for the children both in the four months following the removal and throughout the pendency of this case."); *see also In re Katelynn S.*, No. M2020-00606-COA-R3-PT, 2020 WL 8022118, at *8 (Tenn. Ct. App. Oct. 1, 2020) ("The statutory four-month period during which the Department must make reasonable efforts and the parent reciprocate them is not limited to the four months immediately following removal.").

### *Mother*

The trial court also concluded that Mother abandoned the Children through her failure to establish a suitable home. As to this ground, the trial court explained:

Upon the [C]hildren's removal, the Mother left the marital home, citing both domestic violence and the fact that the Paternal Grandfather remained living there. At that point, she was taken by DCS to a local hotel and then to a women's shelter. Afterwards, the Mother's housing situation became slightly more ambiguous, but, ultimately, she relocated to Kentucky, and has remained in Kentucky from 2018 through the present date. Once she relocated to Kentucky, DCS attempted the ICPC process with that State, but the ICPC request was denied due to Mother's noncompliance. DCS argued that it made reasonable efforts to assist the Mother with securing housing by providing her a list of suitable housing options, an assertion that the Mother disputed.

To the Court, the primary issue with the Mother's housing is not the period between the point of removal and the point where the Mother relocated to Kentucky (though that four months is statutorily relevant), but the ICPC process that was then denied on three separate occasions. Mr. Turner testified about the ICPC process and indicated that the sending State is not the one who makes the determination as to accept or deny it. That decision belongs solely to the accepting State.

\* \* \*

The Court finds by clear and convincing evidence that the Mother has abandoned the [C]hildren by failing to provide them with a suitable home. It has been two years since the [C]hildren entered foster care, and besides the Mother's own home she offered no other reasonable housing solutions for the [C]hildren. DCS made reasonable efforts to work with the Mother so they could return the [C]hildren to the Mother's home. As the Mother has been a Kentucky resident since 2018, and has had three separate denials of her ICPC request by that State, it is obvious that her home is not acceptable. Further, this Court cannot order Kentucky, a sovereign entity outside of this Court's jurisdiction, to accept a Tennessee ICPC. The only way the Mother's home would be cleared for the [C]hildren to return would be to remove them from DCS custody and immediately restore them to the Mother's custody. That is something that this Court is unwilling to do.

The record supports the trial court's findings. Throughout the custodial period, there were multiple four-month periods in which DCS made reasonable efforts to assist

Mother in establishing a suitable home for the Children. Immediately following the Children's removal, DCS paid for Mother to stay in a motel and then a women's home. Soon after, however, Mother opted to move to Kentucky. This move complicated DCS's ability to assist Mother; nonetheless, DCS communicated regularly with Mother, helped her with transportation, and encouraged her to address her mental health issues. DCS also requested multiple ICPC inspections from Kentucky, all of which were denied based on circumstances outside of DCS's control. Although the record shows DCS did what it could under the circumstances, Mother's decision to move out of state inevitably hampered DCS's ability to assist her.

Although Mother had housing provided by her parents throughout the case, Mother's failure to establish a suitable home stems primarily from her refusal to address her mental health issues. A suitable home requires "more than a proper physical living location[,]" *In re Daniel B.*, 2020 WL 3955703, at *4 (quotation omitted), and a parent's unaddressed mental health problems can amount to a failure to establish a suitable home. *See In re Daylan D.*, 2021 WL 5183087, at *5 (collecting cases). Kentucky's refusal to approve Mother's home for placement had more to do with Mother's behavior than the physical condition of Mother's residences, and the record corroborates those concerns.

Indeed, Mother's testimony at trial regarding the abuse allegations against Father inspires little confidence that Mother grasps the gravity of the situation, and the DCBS notes contained in the record demonstrate that Mother could not answer basic questions about her plans to care for the Children. Further, Mother's pattern of inappropriate communication with the Children, such as repeatedly telling them they would be coming home soon and suggesting that Foster Parents were not feeding the Children, also demonstrate that Mother is unable to intuit the Children's best interests. Nonetheless, when DCS suggested that Mother undergo further evaluation and treatment to address her issues and attempted to organize funding for same, Mother was recalcitrant and never completed this requirement.

On appeal, Mother argues that "there is ample reason to doubt the veracity of [the ICPC] denials and whether the Kentucky ICPC had sufficient information to adequately review the suitability of Mother's home." She also urges that the trial court erred in relying on the ICPC denials in concluding that Mother failed to establish a suitable home. Mother cites no authority to support either argument. Moreover, we agree with the trial court that the ICPC denials are probative. The record reflects that Kentucky's DCBS was concerned with Mother's mental health and that Mother was unable to accommodate the Children's special needs. Mother's testimony at trial only buttressed those concerns. We are unpersuaded by Mother's argument in this regard.

Ultimately, "Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the Children and resulted in her inability to provide a suitable home environment." *In re Roderick R.*, No. E2017-01504-COA-R3-PT,

- 23 -

2018 WL 1748000, at *12 (Tenn. Ct. App. Apr. 11, 2018); *see also In re William B.*, No. M2020-01187-COA-R3-PT, 2021 WL 4935740, at *22 (Tenn. Ct. App. Oct. 22, 2021) (affirming trial court's termination of mother's right under this ground based upon mother's "failure to participate in individual counseling, sig[n] releases and complete a more in-depth psychological evaluation"). Moreover, based on Mother's testimony at trial, it is unlikely she will be able to provide a suitable home for the Children at an early date.

The trial court's decision to terminate Mother parental rights for failure to provide a suitable home is supported by clear and convincing evidence and is therefore affirmed.

**C. Failure to Manifest an Ability and Willingness to Assume Custody**

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination when:

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, *13 (Tenn. Ct. App. June 20, 2018)).

Regarding the second prong of section 36-1-113(g)(14), this Court has previously explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the

- 24 -

harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

### *Father*

In the present case, the trial court found that Father manifested a willingness to assume custody of the Children, but not the ability. In relevant part, the trial court explained:

> The Court finds by clear and convincing evidence that the Father has failed to manifest an ability and willingness to assume custody of the [C]hildren. As with the Mother, the willingness is there and, at least, unlike the Mother, the Father completed some necessary tasks before the Petition for Termination was filed and one after the Petition was filed. Plus, unlike the Mother, the Father demonstrated at least some self-awareness that reunification is a process, and one that he is actually nervous about. Even so, the Court doubts the Father's *ability* to assume custody primarily because he either a) abused the [C]hildren or b) failed to protect the [C]hildren from abuse; given the testimony, those are the only two options available. Further, because of unsubstantiated "allegations" the Father has demonstrated a fundamental unwillingness to parent the [C]hildren – he was uninvolved in toilet-training and he seemed only vaguely involved in the [C]hildren's schooling and threw up his hands when confronted with a differing opinion than that of the parents'. Finally, the Father's unwillingness to assume responsibility for the things that happened under his own roof and his willingness to assert that everything has been a false allegation is certainly troubling.

The trial court appears to find that Father manifested a willingness to assume custody of the Children, but failed to manifest the ability to assume custody of the Children. Another statement in the trial court's order provides that "there is little doubt that the Father wants to assume physical and legal custody" of the Children. Towards the end of the relevant section, however, the trial court suggests that perhaps Father failed to manifest a willingness to assume custody of the Children, insofar as Father admittedly was not involved in the Children's toilet-training and schooling. This discrepancy is inapposite because we agree with the trial court that Father failed to manifest the ability to assume legal and physical custody of the Children. Such a finding is sufficient to satisfy the first prong of section 36-1-113(g)(14). *See In re Neveah M.*, 614 S.W.3d at 677.

A parent's ability to assume custody speaks to "the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at

*8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). Here, Father's lifestyle and circumstances are such that he cannot safely assume custody of the Children because Father essentially takes no responsibility for the condition the Children were found in. He denied all allegations of abuse and neglect himself but offered no alternative explanation as to why he failed to protect the Children from the alleged abuse at the hands of Mother and C.N. Indeed, Father adamantly maintained at trial that C.N. was the one who "waterboarded" one of the younger children and that she had previously threatened them with a knife and a gun. While Father was quick to blame C.N. and Mother for the deplorable circumstances under which the Children were removed, Father's testimony leads us to question whether Father grasps the gravity of the situation and whether he is capable of protecting the Children. We also agree with the trial court's finding that Father admittedly failed to meet basic needs of the Children such as toilet-training, and blamed the Children's condition at the time of their removal entirely on Mother. Father also blamed DCS inasmuch as Father's explanation for failing to assist in toilet-training the Children was fear of being "accused of things" by the agency. Father's testimony reflects that he is unable to provide the fundamental care and protection required to assume custody and safely parent children.

On appeal, Father urges that the trial court failed to make a specific finding that placing the Children in Father's custody poses a risk of substantial harm to the physical or psychological welfare of the Children. We disagree. In the trial court's order, in a separate paragraph from the one quoted above, the trial court noted:

> DCS argued that by both act and omission, [Parents] have failed to manifest a willingness and ability to assume legal and physical custody and financial responsibility, and that by the parents assuming custody, it would pose a risk of physical or psychological harm to the [C]hildren. The Court agrees.

Taking the trial court's order as a whole, the above statement is sufficient to satisfy the second prong of section 36-1-113(g)(14). Further, the record does not preponderate against the finding that placing the Children in Father's custody would pose a risk of substantial physical or psychological harm to the Children. The Children's reactions to the possibility of being returned to Father were disturbing. The older children articulated fear and anxiety, and C.N. threatened to commit suicide if Father were to assume custody. T.D. regressed to having bowel movements on himself after learning that Father was released from jail. The mere suggestion of Father's release from prison caused the Children physical and psychological harm. Clear and convincing evidence supports the trial court's finding that the Children would be at serious risk if returned to Father. Tenn. Code Ann. § 36-1-113(g)(14).

Accordingly, the trial court's decision to terminate Father's parental rights pursuant to this statutory ground is affirmed.

*Mother*

Likewise, the trial court concluded that while Mother clearly wanted the Children returned to her custody, Mother failed to manifest the ability to assume legal and physical custody the Children. In pertinent part, the trial court found:

> There is little doubt in the Court's mind that the Mother is willing to assume both legal and physical custody of the [C]hildren. In fact, one of the earliest parts of her testimony was that she wanted the [C]hildren placed back with her "today" as DCS had no grounds to take the [C]hildren. She testified that she had never been told the [C]hildren could not return to her home, as she had been told that she had not done anything to them. The problem, however is that the Court is not satisfied that the Mother has the ability to parent the [C]hildren, and the Court believes that placing the [C]hildren in the Mother's custody would pose a risk of substantial harm to their physical and psychological welfare.

> At times, the proof was, frankly, brutal. When the [C]hildren entered DCS custody, [C.N.] was the alleged victim of severe child abuse and apparently had made statements about self-harm; [T.D.] was eight (8) years old with a 25 word vocabulary, and not toilet-trained; and [S.D.] was five (5) years old and not toilet trained. All of the [C]hildren seemed to suffer from other developmental delays. Further, there was considerable testimony by the Mother of the Father's verbal and/or psychological abuse of the [C]hildren- by threats, hand prints, and inappropriate discipline (including naked calisthenics, and water-boarding). The Mother opined that the Father's discipline was "not normal." Further, the Mother disclosed physical abuse of the [C]hildren perpetrated against them by the Paternal Grandfather (including visible bruising on [T.D.]). All the while, however, the Mother said and did nothing to protect the [C]hildren from the aforesaid abuse, save that she would attempt to de-escalate the situation with the Father by saying "cool it" when his temper "exploded." The Mother's explanation for this failure to protect was unconvincing, not credible, and, more so, her statements that the [C]hildren would not be safe around the Father – but his visits should be supervised – do not fill the Court with any great confidence that the [C]hildren would be protected in the Mother's care.

> \*      \*      \*

> The Court finds by clear and convincing evidence that the Mother has failed to manifest an ability and willingness to assume custody of the [C]hildren. While the willingness might be there, the ability is not. She allowed an 8 year old child and a 5 year old child to go without being toilet-

trained, a situation easily rectified and remedied by three months of foster care. [Mother] knowingly allowed the [C]hildren to be abused by the Father and, perhaps, the Paternal Grandfather and she failed to protect them from it. Her inability to construct a concrete plan of reunification after two years of custody is concerning. Her inability to meet the necessary requirements of the ICPC are problematic. Taken singularly or all together, these facts pose a risk of substantial harm to the [C]hildren's physical and psychological welfare.

The record does not preponderate against the trial court's findings, and we agree that clear and convincing evidence shows Mother lacks the ability to assume custody of the Children. Although the Children were removed from Mother's custody for nearly two years prior to trial, Mother failed to address her mental health issues and never sought reinstatement of her visitation after it was suspended. Kentucky denied Mother's ICPC requests because Mother was unable to answer questions about her plans to care for the Children, including where Mother would enroll the Children in school and how she would transport them there. Further, we agree with the trial court that Mother's trial testimony inspires no confidence in Mother's parenting. While Mother admitted that Father and Grandfather had harmed the Children, Mother testified that this was rooted in Father's "abilities." Consequently, Mother blamed the abuse and neglect allegations squarely on Father, but at the same time justified Father's behavior. Mother's answers to questions at trial were evasive, and she offered no real explanation as to why T.D. and S.D. were never toilet-trained.

We are further troubled by Mother's behavior prior to having her contact with the Children limited, as the record reflects that Mother frequently told the Children inappropriate details about the ongoing case and made unfounded accusations against Foster Parents. This behavior distressed the Children and calls into question Mother's ability to prioritize their well-being. *See In re William B.*, 2021 WL 4935740, at *23 (concluding that mother failed to manifest the ability and willingness to assume custody when mother refused to address mental health issues, and mother's visitation had to be suspended because mother could not behave in an appropriate manner). Despite all of the foregoing, Mother was adamant at trial that DCS never had grounds to remove the Children. Accordingly, Mother's lifestyle and circumstances are such that she is not able to safely parent the Children.

We also agree with the trial court that reinstating Mother's custody poses a risk of substantial harm to the physical or psychological welfare of the Children. As discussed at length, the Children were at best severely neglected, if not severely abused, while in Parents' care. Mother's testimony does not reflect that she has learned from this experience or comprehends why the Children were removed at all. Moreover, the Children made significant strides during the custodial period. Consequently, the second prong of section 36-1-113(g)(14) was proven by clear and convincing evidence.

The termination of Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(14) is therefore affirmed.

**D. Persistence of Conditions**

Next, the trial court terminated Parents' rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3). Section (g)(3) provides that termination may occur when:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

As we have previously explained:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [ ] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights

- 29 -

is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, [2008 WL 4613576, at *20] (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016). Additionally,

> this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, 2021 WL 5183087, at *9.

In the present case, the Children were removed from Parents' custody by a court order entered in a dependency and neglect action, and the Children have been in DCS custody since August 23, 2018. Accordingly, we must determine whether conditions persist that prevent the safe return of the Children, whether the conditions are likely to be remedied at an early date, and whether a continued relationship with Parents prevents early integration of the Children into a stable, permanent home. Tenn. Code Ann. § 36-1-113(g)(3).

### Father

The trial court determined that the conditions underpinning the Children's removal persist and that there is little likelihood the Children can be safely returned to either parent. With regard to Father, the trial court found in pertinent part:

> The great concern to the Court [ ] is still the underlying allegations against the Father, allegations he consistently denied as "false" even though some of those allegations were borne out by the testimony. While the Father was convicted of Attempted Aggravated Child Abuse (against C.N.), there was significant testimony of his inappropriate conduct with all of the [C]hildren. . . . and despite his testimony that Mother abused the [C]hildren he barely lifted a finger to protect them.
>
> *          *          *
>
> The Court finds by clear and convincing evidence that the conditions

- 30 -

that led to the [C]hildren's removal still exist. Additionally, the Court finds that those conditions prevent the [C]hildren's safe return to the care of the Father as, in all reasonable probability, the [C]hildren would be subjected to further abuse and neglect.

The record does not preponderate against the above findings. The trial court also does not appear to have credited Father's testimony that all of the abuse allegations against him are false. In any event, by both Parents' accounts, the Children were abused while in Parents' custody, although Parents blame one another and C.N. Although we acknowledge some steps Father has taken towards remedying the conditions at issue, such as completing anger management and parenting classes, Father essentially refused at trial to assume any responsibility for the extremely poor condition in which the Children were found. This refusal, coupled with the trial court's finding that the testimony bore out the allegations against Father, establishes that the conditions underpinning the Children's removal persist and are unlikely to be remedied at an early date, if ever. Stated simply, Father's parenting, and in some instances total lack of parenting, necessitated removal of the Children, and Father's testimony does not reflect an understanding of this. *See In re Navada N.*, 498 S.W.3d at 605 ("A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." (quoting *In re A.R.*, 2008 WL 4613576, at *20)); *see also In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *8 (Tenn. Ct. App. Sept. 3, 2020) ("Mother's refusal to acknowledge any deficiencies in her parenting inspires little confidence that this condition will be remedied in the near future, or that safe reintegration of the Child into Mother's home is possible.").

Further, the Children's well-documented, visceral reactions to the possibility of returning to Father's care demonstrate that a continued relationship with Father is an impediment to the long-term safety and stability of the Children, as well as the possibility of their integration into a permanent home. Tenn. Code Ann. § 36-1-113(g)(3). As such, persistence of conditions was proven by clear and convincing evidence as to Father.

### *Mother*

We likewise conclude that clear and convincing evidence supports termination of Mother's parental rights for persistence of conditions. Here, the trial court found in pertinent part:

[Mother's] lack of understanding of the basic problems that resulted in her children being in DCS custody is problematic. These were children in a wide arc of ages, and two of them were not toilet-trained; one of them had a vocabulary of 25 words; and one of them was still using a sippy-cup at four and bed-wetting until she was 14 years old. The fact that many of those issues were solved within the first six months of the [C]hildren entering foster care

- 31 -

is staggering; and, despite the argument to the contrary that it was a socio-economic issue, it really was a care issue and the Mother was not demonstrating a level of care that these children needed. Even the fact that she is banking solely on the school system to recognize her children's needs and provide for them demonstrates a poor understanding of her own children, what they need, and why they need it.

The Court finds by clear and convincing evidence that the conditions that led to the [C]hildren's removal still exist. Additionally, the Court finds that those conditions prevent the [C]hildren's safe return to the care of the Mother as, in all reasonable probability, the [C]hildren would be subjected to further abuse and neglect. The Mother is no closer to providing the [C]hildren with a safe and stable home in 2020 as she was in 2019. Further, the Mother's lack of understanding of her children's condition at the time they were removed is problematic, and her lack of understanding of her [C]hildren's needs now continues to provide more questions than answers.

The record does not preponderate against the trial court's findings. Most problematic is Mother's insistence that, despite the Children's undisputed problems, DCS had no reason to remove them to begin with. Mother was even dismissive of the fact that T.D. was eight years old and not toilet-trained at the time of removal. Mother argues on appeal that she did not require further mental health treatment, despite the record being replete with examples establishing otherwise. We have repeatedly held that conditions underpinning removal persist when the parent outright refuses to acknowledge the conditions at all. *See In re Sebashtian K.*, No. E2020-01439-COA-R3-PT, 2021 WL 5071966, at *6 (Tenn. Ct. App. Nov. 2, 2021) (ground proven when father "had yet to acknowledge, much less properly address, his anger issues"); *In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *9 (Tenn. Ct. App. May 21, 2021) (father's refusal to acknowledge domestic violence in home and insistent blaming of mother indicated this condition persisted and was unlikely to be remedied); *In re Briana H.*, No. M2017-02296-COA-R3-PT, 2018 WL 4191227, at *8 (Tenn. Ct. App. Aug. 31, 2018) (noting mother's flippant attitude towards sobriety issues buttressed finding that conditions persisted).

Mother also argues in her appellate brief that the initial reasons for removal were related to Father and Grandfather rather than Mother. While it is true that abuse allegations were made initially against Father, the Children were also removed based upon extreme neglect which Mother had a hand in. Moreover, during the custodial period it became evident that Mother needed mental health treatment and lacked the ability to provide for the Children's basic needs. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) (emphasis added) ("[C]onditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, **or other conditions exist that**, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]"); *see also*

*In re Daylan D.*, 2021 WL 5183087, at \*9 ("[E]ven if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown."). Mother's argument is unavailing under the circumstances.

Finally, we also conclude that a continuing relationship with Mother impedes the Children's opportunity for integration into a safe, stable, and permanent home. The Children had been in foster care for nearly two years by the time of trial with little to no improvement from Mother. Further, Mother frequently told the Children they were coming home, shared information about the case with them which in some instances caused the Children to regress, and generally disrupted an otherwise stable placement. Nonetheless, the Children all made strides in foster care and had improved significantly by the time of trial. Under the circumstances, the trial court did not err in concluding that the elements of section 36-1-113(g)(3) were proven by clear and convincing evidence.

The termination of Mother's parental rights for persistence of conditions is therefore affirmed.

### E. Severe Abuse

Parental rights may be terminated when "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4). Severe abuse includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(27)(A)(i). Severe abuse also includes "[t]he commission of any act towards the child prohibited by . . . § 39-15-402[.]" *Id.* § 37-1-102(b)(27)(C). We recently explained that:

> [i]t is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury . . .

> *In re S.J.*, 387 S.W.3d 576, 591-592 (Tenn. Ct. App. 2012). We have previously held "[a] parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004).

*In re Markus E.*, No. M2019-01079-COA-R3-PT, 2021 WL 5571818, at *7–8 (Tenn. Ct. App. Nov. 30, 2021).

### *Father*

The trial court terminated Father's parental rights pursuant to section 36-1-113(g)(4) on the basis that 1) Father was convicted of attempted aggravated child abuse under section 39-15-402, and 2) Father knowingly exposed the Children to systemic abuse or neglect that was likely to cause serious bodily injury. The record does not preponderate against these findings. Section 37-1-102(b)(27) defines severe abuse, *inter alia*, as conduct prohibited by section 39-15-402, the statute under which Father was undisputedly convicted. Further, Father testified at trial to witnessing several instances during which he "should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re Markus E.*, 2021 WL5571818, at *7 (quoting *In re R.C.P.*, 2004 WL 1567122, at *7). For example, Father testified about C.N. pointing a gun at one of her younger brothers; Father also testified that C.N. once locked T.D. in the bathroom and held him under the bathtub faucet with a rag in his mouth. According to Father, T.D. was approximately four when this occurred, meaning Father continued to allow C.N. around the younger children for the next four years following that incident. While Father relayed these instances primarily to deflect blame from himself, his own testimony establishes Father's failure to protect the Children. As the trial court aptly noted, the only conclusions to be drawn about each parent in this particular case is that they either inflicted abuse themselves or bore witness to abuse by another and did nothing.

We affirm the trial court's conclusion that Father's parental rights should be terminated pursuant to section 36-1-113(g)(4).

### *Mother*

Mother's parental rights were also terminated for severe abuse, the trial court finding that Mother too "fail[ed] to protect the [C]hildren from what appears to be systemic abuse or neglect that was likely to cause serious bodily injury[.]" Specifically, the trial court pointed to Mother's testimony that she knew Father's discipline of the Children "wasn't normal" and that the Children disclosed instances of abuse to Mother.

We agree with the trial court's conclusion, and many other points in the record buttress the finding that Mother knowingly failed to protect the Children from abuse or neglect that was likely to cause serious bodily injury or death. Tenn. Code Ann. § 37-1-102(b)(27)(A)(i). For example, Mother testified to knowing that T.D. was beaten with a gun stock by Grandfather, and at one point disclosed to a DCS worker that Mother believed C.N. was molesting S.D. Mother also testified to seeing hand prints on the Children and that once, when D.D. was an infant, Mother caught Grandfather pricking D.D.'s genitalia with a pin. Mother's account of the Children's treatment in the family home is disturbing; even more disturbing is Mother's contention that the Children were safe with her because she understood Father's "abilities" and would tell Father to "cool it" when necessary. Mother asserts on appeal that "the record is completely devoid of any such injuries actually taking place with respect to any of the Children in this matter. Moreover, the types of abuse the Father and paternal grandfather were accused of committing, at least that Mother was accused of having knowledge of, was more psychological than physical." As outlined above, however, this is simply not the case.

The trial court correctly concluded that, based on clear and convincing evidence, Mother's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(4).

### F. Sentence of two years or more years for conduct against a child

The final ground for termination found by the trial court applies only to Father. At the time the petition for termination was filed, Tennessee Code Annotated section 36-1-113(g)(5) provided that termination may occur when:

[t]he parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian[.]

Here, Father pleaded guilty and was sentenced to twelve years for attempted aggravated child abuse involving a child under the age of eight years old. Father testified that this charge arose from the allegations regarding C.N.,[14] who is the half-sibling of the

---

[14] Father testified that the criminal charges arose out of allegations made by C.N. regarding abuse

other children and who permanently resided in Parents' home. *See id.* The crime for which Father was convicted falls within the definition of severe child abuse found at Tennessee Code Annotated section 37-1-102, as required by section 36-1-113(g)(5). *See In re Kayden A.*, No. W2020-00650-COA-R3-PT, 2021 WL 408860, at *11 (Tenn. Ct. App. Feb. 5, 2021) (upholding termination pursuant to section (g)(5) based on guilty plea for attempted aggravated child abuse); *In re Adrian M.-M.*, No. W2019-00931-COA-R3-PT, 2019 WL 5595846, at *11 (Tenn. Ct. App. Oct. 30, 2019) (same). Further, as the statute explains, it is inapposite that Father was not required to serve his full twelve-year sentence.

We find, as the trial court did, that clear and convincing evidence supports termination of Father's parental rights pursuant to section 36-1-113(g)(5).

Having determined that several grounds for termination were correctly found as to Mother and Father, we turn to the best interests of the Children. *See* Tenn. Code Ann. § 36-1-113(c)(2).

## II. Best Interests

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interest analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

We consider nine statutory factors when analyzing best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other

---

that occurred several years prior to the Children's removal; the associated criminal court judgment lists the offense date as July 2005.

contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

This list is non-exhaustive.[15] *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

In the present case, the trial court made detailed findings of fact and conclusions of

---

[15] The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i). *See* 2021 Tenn. Pub. Acts, ch. 190 § 1. This amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

law regarding the Children's best interests, ultimately concluding that termination of Parents' rights was warranted. We have no hesitation affirming the trial court's findings in this case. Turning to the factors, the trial court found that Parents failed to meaningfully adjust their circumstances, conduct, and conditions and we agree. Tenn. Code Ann. § 36-1-113(i)(1). At trial, Mother remained adamant that DCS had no grounds to remove the Children to begin with; further, Mother failed to fully address her mental health issues. Father, on the other hand, made some adjustments to his conduct and circumstances but, ultimately, remains in a home that is unsafe for the Children. This factor favors termination. In the same vein, DCS made reasonable efforts to assist both Parents. *Id.* § 36-1-113(i)(2). DCS communicated with Parents and provided them with access to other various resources. Nonetheless, Parents' trial testimony does not reflect that a meaningful change in their parenting is possible. *Id.*

With regard to visitation, the trial court found that neither parent had visitation with the Children by the time of trial and that this was due to Parents' own behavior. *Id.* § 36-1-113(i)(3). The record does not preponderate against this finding, although we note that Father took some of the steps necessary to regain his visitation and this was denied by the trial court.

Addressing the fourth factor, the trial court found that there was evidence of a relationship between the Children and Parents, but that the "spector of abuse and neglect haunts this case." *See id.* § 36-1-113(i)(4). The record reflects that the Children asked about Mother often during the custodial period and that the older children frequently articulated their desire to live with Mother. Although we agree with the trial court that the relationship was complicated, the Children indeed had a bond with Mother. This factor militates in favor of Mother. On the other hand, the record shows that the Children exhibited fear and anxiety over their relationship with Father. D.D. explicitly told the Children's FSW that the Children did not want to be returned to Father's care. As to Father, factor four favors termination. *Id.*

The trial court also found that given the Children's progress in their DCS placement, a change in caretaker and physical environment would be detrimental to their development. *Id.* § 36-1-113(i)(5). We agree, and under the particular circumstances of this case, this factor heavily favors termination of both Parents' rights. The mental, emotional, and physical condition of the Children upon their removal was dire. DCS records show that the Children have all benefitted from various forms of therapy and a safe and stable home; moreover, Mother was unable, at multiple junctures in this case, to articulate or follow any plans of care for the Children. Unfortunately, we are confident that the Children would regress to their pre-removal state if returned to Parents. Factor five militates in favor of termination. *Id.* For the same reasons, factors six, seven, and eight also weigh heavily against Parents in this case. *Id.* § 36-1-113(i)(6)–(8).

Finally, there was little to no evidence presented regarding child support. In the

absence of any evidence on this issue, factor nine favors neither party. *Id.* § 36-1-113(i)(9).

Based on all of the foregoing, the trial court correctly concluded that termination of Parents' rights serves the Children's best interests.

## CONCLUSION

We affirm in part and reverse in part the judgment of the Sumner County Juvenile Court and tax the costs of this appeal to the Appellants, Deanna D. and David D., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE